UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

WENDY URBAN,

                           Plaintiff(s),

          -against-

CAPITAL FITNESS d/b/a XSPORT FITNESS,

                           Defendant(s).

-------------------------------------------------------------------X

**MEMORANDUM &
ORDER**
CV08-3858(WDW)

**APPEARANCES:**
Jennifer H. Kay, Esq.
Tribler Orpett & Meyer, P.C.
225 West Washington St.
Suite 1300
Chicago, IL 60606
Attorney for Defendant Capital Fitness d/b/a XSport Fitness

Alan Serrins, Esq. & Ann Macadangdang, Esq.
Serrins & Associates, LLC
233 Broadway, 18th Floor
New York, NY 10270
Attorneys for Plaintiff

**WALL, Magistrate Judge:**

       Before the court, on consent to my jurisdiction, is the defendant's motion for summary

judgment. For the reasons set forth herein, the motion is granted in part and denied in part. The

hostile work environment claim is dismissed, the retaliation claim will go to trial, and the issue

of mitigation of damages will be determined at trial.

**PROCEDURAL BACKGROUND**

       The plaintiff, Wendy Urban, commenced this action on September 22, 2008 pursuant to

Title VII and the New York Human Rights Law, alleging a hostile work environment caused by

co-employee, non-party Christopher Hoffman and supervisor, non-party Mark Kilkuskie[1] at the

---

       [1]In her Complaint, the plaintiff does not accuse Kilkuskie of creating a hostile work
environment, only of retaliating against her. In her deposition testimony and affidavit in

gym run by defendant Capital Fitness ("Capital")[2] where they all worked. Urban alleges that she reported Hoffman's alleged inappropriate behavior to her supervisors at Capital, and nothing was done. She further alleges that, as a result of her complaints, she was subjected to retaliatory treatment by non-party Mark Kilkuskie, the gym's General Manager,and was ultimately terminated from her employment in retaliation. *See* Complaint, DE[1]. On February 13, 2009, the parties consented to my jurisdiction. DE[16]. On August 3, 2010, the instant, fully briefed motion was filed with the court. DE[26]- DE[3].

## FACTUAL BACKGROUND

The facts relevant to this motion are taken from the parties' Rule 56.1 Statement (DE[23-1]) and Counterstatement (DE[23-2]) and the evidentiary citations therein. Facts not relevant to the motion are not included. Urban was employed at the gym run by defendant Capital as a spa manager supervising approximately 25 employees, starting around August 15, 2006 and ending in July 2007. Rule 56.1 Stmts., ¶¶1, 12-14. During most or all of the term of her employment, Christopher Hoffman was the Operations Manager of the gym, and Mark Kilkuskie was the General Manager. Def. 56.1 ¶¶39 &42. Capital states that non-party Dennis Pierro, who sent Urban a letter relevant to her claim of retaliatory termination, has been a vice-president of Capital for approximately 14 years, handling corporate insurance, real estate and human resource issues. Def. 56.1 ¶¶17-19. Urban disputes his title and job responsibilities. Pl. 56.1 ¶¶17-19. Urban admits that she never told Pierro that she was having problems with Chris Hoffman or Mark

---

opposition to this motion, however, she includes him in her hostile work environment claim.

[2]The parties disagree as to the correct name for the defendant. The court finds that dispute to be irrelevant to this motion and refers to the defendant as Capital Fitness or Capital in this Memorandum & Order. The reference does not suggest any finding regarding the name(s).

Kilkuskie, whose behavior she complains of in this lawsuit, although she says that is immaterial to her claims because she complained about those men to her direct supervisor, Jamee Taylor. 56.1 Stmts. ¶¶28-30.

Urban spoke with Jamee Taylor frequently by phone and Taylor visited the gym where Urban worked every few weeks. 56.1 Stmts. ¶¶35 & 36. In November 2006, Urban told Taylor that employee Michelle O'Brien had told Urban that Chris Hoffman, the gym's operations manager, made a comment about O'Brien's body. Capital states that Taylor reported the complaint to either Kathleen Wade or Andy Braun, while Urban states that Taylor reported it to Wade, not Braun. 56.1 Stmts. ¶37. Urban maintains that she complained frequently to Taylor about Hoffman's behavior, including claims that he leered at female employees and touched them inappropriately, and recounts numerous second hand complaints from other women to her about Hoffman. Capital states that no employee complained about Hoffman's leering or touching. Def. 56.1 ¶¶61 & 62. Urban also recounts numerous instances of Kilkuskie's cursing, and complained to Taylor about it. 56.1 Stmts. ¶71. In her Complaint, Urban alleges that, after she reported the O'Brien complaint to Taylor in November 2006, retaliatory behavior by Kilkuskie began, including cursing at her and her staff, telling her she would not get back money she spent on work supplies, disparaging her comments at meetings, and informing other employees that she was "so fucking done" at Capital. DE[1], Compl. ¶18.

The parties present widely conflicting versions of how Urban came to be terminated from her employment with Capital. Urban alleges that she had a meeting with Kathie Wade on July 26, at which Wade questioned whether Urban had gotten permission for a particular promotion involving discounts to customers. Urban said that Kilkuskie had approved the promotion when

she asked his permission by saying: "I don't give a shit what the fuck you do, just make the fucking numbers." DE[26], Ex. B, Urban Dep. Tr.138:9-24. Kilkuskie told Wade, however, that he had not approved it, which Wade reported back to Urban. Urban maintains that the retaliatory treatment and harassment that had started back in November broke her down and that she started to cry and said she would take the rest of the day off. Urban Tr. 142:12-20. Urban testified that she called her supervisor, Taylor, to tell her that she was taking the day off and that Taylor told her not to worry, that she would talk to Wade and to Kelly Cartwright, Capital's Customer Service Representative. Urban Tr. 144:22-149:12. At her deposition, Taylor testified that she did not talk to Urban on that day, that she was on vacation with her cell phone turned off. DE[26], Ex. D, Taylor Dep. Tr., 59:17-64:7. Taylor testified that she did speak to Urban a few days later, when Urban called her. Taylor Tr. 64:10.

Urban reports that, after she left that day, she told Kelly Cartwright about all of her complaints of sexual harassment and how she felt her job was threatened. She alleges that Ms. Cartwright told her to take a leave of absence while the issues were being worked out. Compl. ¶19. Cartwright agrees that Urban reported numerous complaints to her, but does not state that she told Urban to take a leave of absence, but instead told her that Urban herself had to call Dennis Pierro. Cartwright also testified that she told Pierro about Urban's complaints. DE[29], Ex. H, 45:21-50:16; 51:22-56:25. Urban says that she had every intention of returning to her job, and that, while on leave she tried to contact Cartwright for a status report, but did not hear back from her. *Id.* ¶20. She reports that she was terminated on August 2, 2007, when Capital sent her a letter signed by Dennis Pierro stating:

> Starting immediately you are banned from entering our club and are

banned from calling or personally contacting our clubs, any employees, agents or any other company location other than in writing.  Any infraction of this demand will be meet [sic] with a request of [sic] the Police Department to arrest you for such infractions. Should your slanderous remarks continue against our employees we will initiate immediate legal action against you.

DE[29] Ex. M.

Capital maintains that Urban left work early on the day that she spoke to Wade, and that Kilkuskie called Pierro to tell him that Urban had "walked out" and did not return to work. Capital states that both Wade and Steven Kramer, Urban's assistant, told Jamee Taylor that Urban had quit.  Urban disputes that.  56.1 Stmts. ¶¶80 & 81.  Capital further reports that within a few days after Urban left early, Taylor told Pierro that she thought Urban had left because she could not take the pressure of having to produce.  Def. 56.1¶85.  Capital also maintains that Steven Kramer called Pierro to say that Urban was calling him at work and that other employees complained that Urban asked them to make statements that were untrue.  Capital characterizes the alleged phone calls as harassing. Kilkuskie testified that two employees, Joe Casanova and Darrel Nagel, told him that Urban had called them asking for help to build a case against Capital. Id. ¶91.  Urban disputes these allegations.  Pierro testified that he spoke to a gym member who said that Urban had contacted him to "get him on her side." The member had gone to the gym's front desk to complain that Urban had contacted him.  *Id.* ¶96-97.  Urban lists alleged discrepancies in defense witnesses' testimony about these facts.  Pl. 56.1 Stmt. ¶86.  Pierro says that he decided to send the August 2 letter after learning of the alleged phone calls by Urban to employees and a member, and that he did not know about her complaints regarding sexual harassment at that time.  A complaint to the EEOC and this lawsuit ensued.

## DISCUSSION

**Summary Judgment Standards:**

Pursuant to Federal Rule of Civil Procedure 56(c), courts may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). At this stage, the burden of proof is on the moving party to show that there is no genuine issue of material fact. *Gallo v. Prudential Residential Services, L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994)(citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975)). A genuine issue of fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L. Ed.2d 202 (1986). In making this determination, the court must view all of the evidence "in the light most favorable" to the non-movant. *Breland-Starling v. Disney Pub. Worldwide*, 166 F. Supp. 2d 826, 829 (S.D.N.Y. 2001)(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). In addition, the court must resolve all ambiguities and draw all inferences in favor of the party opposing the motion. *Ackerman v. National Financial Systems*, 81 F. Supp. 2d 434 (E.D.N.Y. 2000). Once the moving party has met its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56; *see Liberty Lobby*, 477 U.S. at 250.

In opposing the motion, the nonmoving party may not rely upon "mere conclusory allegations, speculation, or conjecture." *Ackerman*, 81 F. Supp. 2d at 436 (citing *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)). However, "if there is evidence in the record as to any

6

material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable." *Holt v. KMI Continental Inc.*, 95 F.3d 123, 129 (2d Cir. 1996). In reviewing the evidence and the inferences that may reasonably be drawn, the court may not make credibility determinations or weigh the evidence . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Kaytor v. Electric Boat Corp.,* 609 F. 3d 537, 545-46 (2d Cir. 2010))(internal citations and emphasis omitted). "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." *Id.* at 546 (citing Fed.R.Civ.P. 56(e) Advisory Committee Note (1963)).

The Second Circuit has indicated that trial courts should be wary of granting summary judgment in discrimination cases since intent and state of mind are typically at issue and direct evidence of discriminatory intent is rare. *Tarshis v. Riese Organization*, 195 F. Supp. 2d 518, 523-24 (S.D.N.Y. 2002); *see also Holtz v. Rockefeller & Co.,Inc.*, 258 F.3d 62, 69 (2d Cir. 2001). Nonetheless, cases involving allegations of workplace discrimination and harassment are still subject to summary judgment, and where the nonmovant fails to demonstrate a genuine issue of material fact, relief may be granted against such claims. *Holtz*, 258 F.3d at 69.

As is routine in this Circuit, the court will treat plaintiff's claims under Title VII and the New York State Human Rights Law as analytically identical, applying the same standard of proof to both claims. *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n. 9 (2d Cir.2008) (considering sex discrimination claims)); *see also Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 609 (2d Cir. 2006) (hostile work environment and retaliation claims subject to same standards

under federal and New York state law).

**Hostile Work Environment Claim:**

Urban claims that she was subjected to a hostile work environment in violation of both Title VII and the NYSHRL. The defendants argue that even if all of her factual assertions are accepted as true for the purposes of this motion, those facts do not rise to the level of hostile work environment as a matter of law. To establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that "'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gorzynski v. Jetblue Airways Corporation,* 596 F.3d 93, 102 (2d Cir. 2010) (quoting *Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir. 2006)). The plaintiff must show both that she subjectively perceived the environment to be abusive and that it was objectively hostile and abusive. *Id.* (internal citations omitted). Unless there is one incident of harassment that is sufficiently severe, "'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id.* (quoting *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002)).

In analyzing a hostile work environment claim, the court must assess the totality of the circumstances and look to the record as a whole. *Id.* In distinguishing between lawful conduct that is merely boorish and offensive, and illegal conduct, the courts consider the following non-exhaustive list of factors: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or merely an offensive utterance; (4) whether the conduct unreasonably interfered with an employee's work performance; and (5)

what psychological harm, if any, resulted. *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). As noted, the plaintiff must subjectively perceive the work environment to be abusive, but the plaintiff's perception does not establish abuse. Instead, the severity of the conduct must be judged objectively, from the perspective of a reasonable person in the plaintiff's position. *Id.* 21-22; *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

In addition to demonstrating a hostile work environment, a plaintiff must also show a basis for imputing the objectionable conduct to her employer. *Gorzynski,* 596 F.3d at 103. Where the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer. *Id.* Where an alleged harasser is a co-worker rather than a supervisor, the employer may be held liable where it "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir. 1997).

For purposes of this motion, the defendant agrees that Urban perceived the workplace to be abusive, and I look to the record to determine if she has raised issues of material fact sufficient to withstand summary judgment as to whether it was also objectively hostile[3]. In that regard, Urban argues, generally, that Chris Hoffman, the Operations Manager, and Mark Kilkuskie, the General Manager, "overly scrutinized" her work performance in comparison to male employees,

---

[3]In considering the plaintiff's allegations, the court looks to the overall record, but the parties are advised that I have not considered the legal argument set out the Affirmation of Urban's counsel, Ann Macadangdang. DE[29]. Legal argument is to be set forth in a Memorandum of Law, not an Affirmation, and the parties cannot be allowed to exceed page limits by setting forth additional legal argument in an inappropriate forum. To the extent that defense counsel's papers ([DE 26], Kay Aff.) include inappropriate legal argument, such argument has also been ignored.

made sexual remarks, and leered. Pl. Mem. in Opp. DE[31] at 1. In her Complaint, Urban alleges that Hoffman's behavior created the hostile work environment and that Kilkuskie's behavior constituted retaliation, but at her deposition and in her affidavit in opposition to the motion, she asserts that behavior by both of them contributed to the hostile work environment and I will consider her claims about Kilkuskie's role in creating a hostile work environment on this motion. *See* [DE]29, Ex. 1, Urban Aff. in Opp., ¶¶4(a)(h)(i)(n); DE[26], Ex. B, Urban Dep. Tr., 130:3-133:8. The specific instances of unwelcome behavior listed by Urban fall, generally, into three categories: (1) comments or behavior personally witnessed or heard by Urban; (2) comments or behavior reported by third parties and supported by affidavits; and (3) comments or behavior reported to Urban by third parties and attested to on this motion only by Urban, without supporting affidavits based on first hand knowledge. In the latter two categories, some of the information was reported to Urban while she worked at Capital, and some of it she learned only after she left.

Capital argues that some of Urban's allegations about Hoffman are raised for the first time in her opposition to summary judgment and that she did not testify to them at her deposition when asked repeatedly to relate <u>all</u> incidents of offensive conduct by Hoffman. DE[30], Reply Mem. at 2. For example, they say that she testified to only a single instance regarding the wearing of provocative clothing, not repeated instances, and that, in her affidavit in opposition, she testified that Hoffman was talking to a female employee when he called someone "sweet lips" or "angel face," while, at her deposition, she testified that she didn't know who Hoffman was talking to. I find that, while there are some discrepancies between Urban's deposition testimony and the details set forth in her affidavit, those details do not affect the determination of

whether a hostile environment existed and the allegations complained of by the defendant will not be excluded on that ground.  Some of the evidence advanced by Urban must, however, be excluded on other grounds.

For example, I will not consider evidence that is hearsay and thus precluded from consideration on a motion for summary judgment by Federal Rule 56(e). "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).  The court must thus determine whether a statement has been offered for its truth, or, as Urban argues here in regard to some of her allegations, to support her claim that she <u>subjectively</u> believed her workplace to be hostile.  DE[31], Mem. in Opp. at 7.   As noted earlier, however, the defendant does not, for purposes of this motion, challenge Urban's claim of subjective belief that a hostile workplace existed.  In applying the hearsay rule to evidence of an objectively hostile workplace, I recognize that second-hand comments, describing events or statements that occurred outside of the plaintiff's presence, may be relevant in evaluating whether a hostile work environment exists, but if such statements are offered for the truth of the matter asserted, they must be supported on a motion for summary judgment by an affidavit or other sworn statement from a person with first hand knowledge.  *See Early v. Wyeth Pharmaceuticals, Inc.,* 603 F. Supp. 2d 556, 579 (S.D.N.Y. 2009)(contentions based on hearsay, not supported by an affiant with first-hand knowledge, not proper for court to consider on motion for summary judgment); *see also Liebovitz v. New York City Transit Auth.*, 252 F.3d 179, 189-90 (2d Cir. 2001)*; Whidbee v. Garzarelli Food Specialities, Inc.,* 223 F.3d 62, 71 (2d Cir. 2000); *Kamrowski v. Morrison Management Specialist*, 2010 WL 3932354, *15 (S.D.N.Y. Sept. 29, 2010).

Evidence supported by sworn statements is properly considered, even if those statements allege things not observed by Urban or known to her while she worked at Capital, because the court is required to consider the totality of the circumstances in the workplace while she worked there. Thus, the fact that Urban did not observe some of the alleged discriminatory behavior would not necessarily render that behavior irrelevant to the hostile work environment claim if there is sworn support for it from a person with first hand knowledge. *See Leibovitz,* 252 F.3d at 190; *Schwapp v. Town of Avon,* 118 F.3d 106, 111-12 (2d Cir. 1997). Here, the plaintiff has submitted excerpts of deposition testimony from Chris Hoffman, Mark Kilkuskie and Phil Faraci and I consider that evidence *infra.* With this background in mind, I turn to the plaintiff's factual allegations.

I look first to the evidence regarding Hoffman witnessed by Urban herself over the course of the eleven months that she worked at Capital. She recounts a comment made by Hoffman to her husband, asking him how he liked being married to a massage therapist, although she is not a massage therapist (DE[26], Ex. B, Urban Dep. Tr., 47:15-48:10); his comments to an unknown person on the phone, referring to someone's hot body and calling someone "sweet lips" and "angel face" (Tr. 49:9-50:23); a comment that he could not control himself from being sexually aroused if he had his hair cut by a particular female employee (Tr. 67:22-68:13); and a comment as to whether a seventeen year old employee's "breasts were getting bigger" (Tr. 195:10-196:6). Urban also complains that, in her presence, Hoffman frequently stared at or ogled women and said "Wow, she's hot" or made comparable comments (Tr. 51:18-53:23); suggested two or three

times[4] that the women employees wear bikinis at beach-themed promotional events (Tr. 56:9-24); once suggested, when a new box of gym T shirts arrived, that the women take off their shirts then and there and put on the new ones (Tr. 57:17-58:12); once commented that a woman named Allegra was "hot" (Tr. 62:8-24); and told Urban that he couldn't believe the body that was under Michelle O'Brien's uniform (Tr. 73:20-74:4). Urban further alleges that she witnessed Hoffman put his arms around women employees and kiss them, and once allowed an employee to wrap her legs around him (Tr. 190:11-25, 221:25-222:9). She also complains that Hoffman wore a name tag that said "Big Daddy" (Tr.127:19-128:11) and said that his employees could "hump" drinks across a room (Tr. 116:8-25), both of which, according to Urban, had sexual overtones. Urban also asserts that, in her hearing, Hoffman said that pretty women are stupid (Tr. 96:6-22). She further reports that he told her she would not be reimbursed for money she had spent on decorative items for a promotion, although she was ultimately repaid. Tr. 202:12-203:25.

Urban also recounts an alleged "threat" made by Hoffman to her. After Urban reported Michelle O'Brien's complaint about Hoffman to Jamee Taylor,[5] Hoffman asked Urban to speak with him privately (Tr. 81:13-16). Taylor had spoken to him about the O'Brien complaint, and Urban asserts that he told her that he knew that Urban must have reported him (Tr. 81:21-24). He then said that he, Urban, and Kilkuskie wanted to be promoted, "and we're not going to get promoted if you air your dirty laundry outside this club." Tr. 82:2-5. During that same

---

[4]This is one of the allegations that Capital says Urban changed. At her deposition, she testified that Hoffman made the bikini suggestion only once.

[5]The substance of that complaint will not be considered on this motion as evidence of a hostile workplace, inasmuch as there is no sworn statement from Ms. O'Brien and to the extent it is offered for its truth, it is hearsay. The fact that Urban reported the remark to Taylor, is, however, both relevant and admissible.

conversation, he complained about rumors that were going around about him, but Urban does not say that he held her accountable for any of the rumors. She reports that he told her that he wanted to be promoted and that he wasn't going to let anybody ruin that for him. Tr. 82:7-23. Urban construes that comment as a threat and further evidence of a hostile work environment.

Urban further asserts that, while she was employed at Capital, Hoffman maintained a MySpace account showing the XSport label and depicting Capital as "selling sex," with pictures of Capital employees in seductive poses. The extent to which Urban herself viewed the website or simply knew that it existed and heard gossip about its content is not entirely clear, but, in her Rule 56.1 counterstatement, she states that she did actually view it several times while she was employed at Capital, without reporting what was on the screen when she did so. DE[23-2] ¶¶54-55. She maintains, however, that upper level people knew about it and failed to do anything about it. *Id.* After she left Capital, she went onto the website and printed out pages, copies of which she has attached as an exhibit to her papers. DE[29], Ex. O. I will consider those printouts for the purpose of this motion, inasmuch as the defendant does not object to them, and they do not alter the conclusion that a hostile workplace did not exist.

As noted earlier, in her opposition to the motion, Urban also asserts that Kilkuskie contributed to the hostile work environment, although she does not make that claim in her complaint. As to him, Urban alleges generally that he held women in disdain; referred at Kathie Wade at meetings to " that fucking Kathie Wade;" berated female spa staff for not "fucking" doing their jobs; ordered Urban to "never leave the fucking spa" before she reached her goal; repeated to Urban that he was "the fucking boss;" and praised male managers but mocked Urban's suggestions, saying that she thought they were "going to make [their] numbers with

fucking Christmas decorations." *Id*. He also allegedly told Urban that she would not be paid back for money she spent on a gym promotional event.

In the second category of evidence not witnessed by Urban but supported by sworn statements is deposition testimony from Phil Faraci, a co-worker of Urban's at Capital[6]. DE[29] Ex. P. In considering Faraci's comments, the court must bear in mind that sworn testimony, to satisfy Rule 56(e), "must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp,* 118 F.3d at 111. To the extent that statements contain "bald assertions and legal conclusions," the court may not rely on them. *Id.* And, the exclusion of hearsay also applies to statements set forth in affidavits. Faraci states that he observed Hoffman staring or leering at women on a daily basis (DE[29], Ex. P, Faraci Dep. Tr. 9:17-22); once saw Hoffman wear a "Big Daddy" name tag, which Faraci felt had a sexual connotation (Tr. 12:14-22, 27:19-28:4); and heard Kilkuskie tell sexual stories to men in the break room (Tr. 21:6-11). He also testified about a Myspace website run by Chris Hoffman that listed various female employees at the gym as his "top friends." Tr. 24:12-26:16. Faraci reports that Hoffman and the young girls who worked at the front desk exchanged MySpace messages that "crossed the line," but he does not remember their content. Tr. 27:9-17. The rest of his testimony consists primarily of hearsay references to complaints by female employees about Hoffman's behavior. The women are not named and there is no sworn testimony from them. Thus, the court cannot assume that the things they said prove the truth of Hoffman's allegedly inappropriate behavior.

The plaintiff also relies on an episode reported by Hoffman himself at his deposition.

---

[6]The plaintiff also submitted a statement from Mr. Faraci, but it is not sworn and will not be considered, except to the extent that he verified its contents at his deposition. *See* DE[29], Ex. Q.

Hoffman recounted a story about a female employee grabbing his penis in front of two male employees and holding it for two seconds. DE[29], Ex. C, 131:4-133:25. He stated that he took the incident as a joke. *Id.* 133:8. In a statement to Dennis Pierro about complaints by the woman who touched his penis, Hoffman said that she shook his penis. DE[29], Ex L, ¶5. Hoffman also testified about the woman open-mouth kissing him in front of staff members and posing for a provocative photo without his asking her to do so.

In the third category of evidence are Urban's assertions about the complaints she received from Michelle O'Brien that Hoffman called her into his office so that he could stare "at her butt," complaints from an employee named Lauren Gaustella, reports about the "Jacuzzi incident," which predated Urban's employment at Capital, rumors of Hoffman having affairs with various people, and reports of his buying chocolates and/or flowers for employees. The court, for the reasons set forth *supra*, will not consider these hearsay allegations.

The court notes, as a threshold matter, that Title VII and the NYSHRL were not intended to sterilize employee relations or to create a generalized code of workplace civility. *See Lucas v. South Nassau Communities Hosp.*, 54 F. Supp. 2d 141, 147 (E.D.N.Y. 1998). As such, work-related conduct that may be described as "immature, nasty, or annoying, without more, is not actionable as sexual harassment." *Nolan v. Epifanio*, 1998 WL 665131, *3 (S.D.N.Y. Sept. 28, 1998). Considering these guidelines and all of the admissible evidence advanced by Urban, I find that the events complained of are not objectively severe for Title VII purposes. While Urban has described a workplace infected with incidents of obnoxious and puerile behavior, she has not produced enough evidence to raise an issue material fact as to whether there was workplace hostility severe or pervasive enough to alter the conditions of her employment or to create an

abusive, not just offensive, working environment.  Most of the allegations about behavior

engaged in by Hoffman and witnessed by Urban were single incidents, and while such isolated

incidents can add up to a hostile work environment, these do not.  Some of the incidents, for

example, wearing a nametag that read "Big Daddy," saying that employees "humped" drinks

across the floor, or suggesting that Urban would not be repaid money she had laid out, do not, on

their face, convey gender related hostility, and, even allowing the inference that they were

sexually suggestive, they were not nearly severe enough to render the workplace hostile, either

alone or as part of the totality of circumstances.  The "threat" by Hoffman that they should not air

dirty laundry suggests no gender related hostility at all and there is no reasonable inference to be

drawn that it did so.  *See Kamrowski,* 2010 WL 3932354 at *15.  Hoffman's comment about the

stupidity of pretty women does convey gender hostility, but  it was a single occurrence that, even

combined with the other alleged incidents and comments, does not suffice to make out a hostile

work environment.

Nor does the more pervasive behavior - leering at women and making comments about

them, and the existence of a MySpace page - rise to a sufficient level of severity.  If every

workplace that employed leering men was a hostile Title VII workplace, the door would open to

nearly "limitless employer liability" not contemplated by the law.  *See Leibovitz,* 252 F.3d 179,

189-90 ( dismissing evidence of hostile workplace in venues where plaintiff did not work).  As to

the MySpace page, Urban, while she worked at Capital, allegedly glimpsed the site a few times

and heard rumors about it from other employees, but there is no admissible evidence that any of

the women who were "friends" with Hoffman on the site were offended or were there

unwillingly, and thus no gender related hostility as to them was added to the totality of

circumstances. However inappropriate it may have been for Hoffman to use the XSport logo, the site was something that an employee had to go out of his or her way to view, and not pervasive in the workplace environment.

Nor does Kilkuskie's behavior amount to a hostile work environment, even when considered as part of the totality of circumstances. Kilkuskie's alleged inability to utter a sentence without some form of the work "fuck" in it was also offensive, but does not necessarily convey gender hostility. Urban testified that she did not know if he used the same language with men and women and it would appear, accepting all of Urban's allegations as true, that Kilkuskie spoke in the same vulgar, adolescent manner to both men and women. There is no evidence that Kilkuskie would have spoken any differently to Urban if she had been a male. *See Kamrowski*, 2010 WL 3932354 at *15 (citations omitted); *see also Benette v. Cinemark, USA, Inc.,* 295 F. Supp. 2d 243, 250-51 (W.D.N.Y. 2003). Further, her claims that Kilkuskie was demeaning to women as evidenced by his treatment of her at staff meetings is not supported by the evidence. Again accepting Urban's factual allegations as true, Kilkuskie was rude and overbearing, but he apparently behaved that way to all staff members, male or female. There is no evidence that his criticisms of Urban's ideas for promotions or ways to meet the production goals had anything to do with gender hostility rather than concern about making financial goals. "Although Title VII protects employees from improper discriminatory intimidation, it does not reach so far as to protect plaintiffs from undiscriminating intimidation by bullish and abusive suprvisors . . . Rather, plaintiff must produce evidence that she was treated differently than others because of her sex." *Benette,* 295 F. Supp. 2d at 250 (internal citations and punctuation omitted). Here, there is no evidence that Kilkuskie treated Urban differently because she was a woman.

No doubt, there was a sexually charged atmosphere at Capital, one which offended Ms. Urban, but, according to her, did not cause psychological harm, one of the factors for the court to consider. *See Harris,* 510 U.S. at 23. Nor was it physically threatening. Much of the behavior described was offensive, but conduct that is merely offensive does not rise to the level of a hostile work environment. *Leibovitz,* 252 F.3d at 189 (citing *Harris,* 510 U.S. at 21)). As one court has noted, a "'hostile' work environment is not synonymous with an unpleasant, harsh, combative or difficult work environment. The nation's workplace is most likely populated with abusive, banal, profane and vulgar supervisors" and co-workers who use "insensitive, profane and vulgar language." *Benette,* 295 F. Supp. 2d at 250. That alone, however, is not enough to make out a hostile work environment, and courts must bear in mind that the "Title VII is not a general civility code." *Id.* (internal citations and punctuation omitted). Further, although a plaintiff can establish a hostile working environment based, to some extent, on the bad treatment of other employees (*See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d. Cir. 2000)), it is not without some significance that the majority of the allegations that do suggest gender based hostility were directed at or were about other women, and not Urban herself. I do not base the conclusion that she has not established a hostile work environment on that detail alone, and it is but a small part of the overall analysis, but it is one detail in the totality of the circumstances and I mention it in that regard.

Because I find that, as a matter of law, there is insufficient evidence to prevent summary judgment on the issue of whether a hostile work environment existed, I need not address the issue of whether there is a basis for imputing objectionable conduct to the employer, an issue that was not, in any event, raised by the defendant. The hostile work environment claim is dismissed.

**Retaliation Claim:**

Plaintiff claims that she was a victim of retaliation in violation of Title VII and the

NYSHRL.  Under those statutes, an employer is prohibited from firing an employee in retaliation

for having made a charge of discrimination.  42 U.S.C. § 2000e-3(a); N.Y. Exec. Law §

296(1)(e).  A claim for retaliation under the NYSHRL is generally governed by the same

standards as Federal claims under Title VII**.**  *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d

597, 609 (2d Cir. 2006).  Title VII is violated when a retaliatory motive plays a part in an adverse

employment action toward an employee and a retaliatory motive need not be the sole cause of

plaintiff's termination*.  Terry v. Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003).

The Court evaluates a Title VII retaliation claim under the *McDonnell Douglas* three-step,

burden-shifting framework.  First, a plaintiff must establish a *prima facie* case of retaliation by

showing that: (1) she participated in an activity protected under Title VII; (2) the employer was

aware of her participation in the protected activity; (3) the employer took adverse action against

her based on her protected activity; and (4) there was a causal connection between the protected

activity and the adverse action taken by the employer.  *Kessler v. Westchester County Dep't of*

*Social Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006); *McMenemy v. City of Rochester*, 241 F.3d

279, 282 (2d Cir. 2001).  The "protected activity" element of a retaliation case turns upon

whether the employee has protested an "unlawful employment practice," within the meaning of

Title VII.  *Wimmer v. Suffolk Co. Police Dep't*, 176 F.3d 125, 134-35, (2d Cir. 1999).  The

practice complained of need not necessarily be illegal under Title VII.  Rather, a cause of action

may exist so long as plaintiff possessed a "good faith, reasonable belief that the underlying

challenged actions of the employer violated the law."  *Manoharan v. Columbia Univ. College of*

*Physicians and Surgeons*, 842 F.2d 590, 593 (2d Cir. 1998).

In determining whether a plaintiff has met the initial burden of establishing a prima facie case, the court's role on a motion for summary judgment is "'to determine only whether the proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" *McIntyre v. Longwood Central School Dist.*, 2009 WL 3113261, *8 (E.D.N.Y. Sept. 30, 2009)(quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). If the employee establishes a prima facie case, "a presumption of retaliation arises" and the employer must then articulate a legitimate, non-retaliatory reason for the adverse employment action." *Jute*, 420 F.3d at173. If the employer offers such proof, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.*

Here, Urban alleges that she was terminated and that the termination was an adverse action,[7] while the defendant maintains that she voluntarily left the workplace and Pierro's letter was sent only after she made phone calls to gym employees and one gym member, seeking their support. Thus, Capital argues, it was Urban's "affirmative acts, not those of the company, which gave rise to her separation of employment," and Capital took no adverse action. DE[27] at 16. I find that there are too many issues of material fact in dispute regarding Urban's "separation of employment" to allow for a ruling on summary judgment. Not only do Urban's sworn statements conflict with those of non-parties, but the non-parties' statements themselves conflict with each

---

[7]The plaintiff also argues that a "threat" by Hoffman constituted an adverse employment action, but I disagree. I find on the record now before the court that his comment that she should not air dirty laundry was not a threat, and Kilkuskie's proximity did not make it one. The relevant adverse action was the end of Urban's employment.

other.  For example, Urban testified that she spoke to Jamee Taylor on the day she left early, and Taylor testified that she did not; Kelly Cartwright testified that she told Pierro about the complaints Urban reported to her, while Pierro disclaims knowledge of them.  Such issues of credibility cannot be determined on summary judgment.  *See Kaytor,* 609 F.3d at 546.

Further, I do not accept Capital's argument that Pierro, who wrote the letter of dismissal, had to have known about Urban's protected activity in order for her to proceed with her retaliation claim.  Urban must prove that <u>Capital</u> knew about it, and there is ample evidence that supervisors did know to withstand summary judgment. Capital admits that Pierro was the ultimate decision maker regarding Urban's termination, "but it was his agents, not him, who allegedly possessed the requisite knowledge." DE[30], Reply Mem. at 8.   If Pierro's "agents" had relevant knowledge, the plaintiff may reasonably argue that they should have passed it on to him.  A corporate employer cannot be shielded by willful or negligent ignorance.  Thus, the motion is denied as to Urban's retaliation claim.

**Urban's Mitigation of Damages:**

The defendant argues that Urban failed to mitigate her damages and seeks an order barring recovery of back and front pay.  Those are issues best addressed at trial.

Dated:     Central Islip, New York                    **SO ORDERED:**
           November 23, 2010

                                        /s/ William D. Wall
                                        WILLIAM D. WALL
                                        United States Magistrate Judge